[No. C038317. Third Dist. Feb. 20, 2003.]

MARK BROCKEY et al., Plaintiffs and Respondents, v.
WALTER MOORE, Defendant and Appellant.

**COUNSEL**

Farmer, Murphy, Smith & Alliston, George E. Murphy and Suzanne M. Nicholson for Defendant and Appellant.

Gary W. Rhoades, Danielle Jones; Cibula and Cibula, Mark Cibula; Heather Cibula and John Gianola for Plaintiffs and Respondents.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Herschel T. Elkins, Assistant Attorney General, Ronald A. Reiter and Robyn C. Smith, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Respondents.

**OPINION**

**MORRISON, J.**—In adopting the Unlawful Detainer Assistants Act (Bus. & Prof. Code, § 6400 et seq., UDAA) the Legislature found in part that "there currently exist numerous unscrupulous individuals . . . who purport to offer protection to tenants from eviction. The[y] . . . represent themselves as legitimate tenants' rights associations, legal consultants, professional legal assistants, paralegals, attorneys, or typing services. . . . The acts of these unscrupulous individuals . . . are particularly despicable in that they target low-income and non-English-speaking Californians as victims for their fraudulent practices." (Stats. 1993, ch. 1011, § 1, pp. 5721-5722.)

Under names such as "Legal Aid" and "Legal Aid Services" defendant Walter Moore operates a business which purports to offer typing services, particularly in eviction cases. Victims of Moore's deception (Mark Brockey, Dawn Gayler, Fred Pavloff and Frank Word, collectively Brockey) were

eventually directed to Legal Services of Northern California's Redding office and obtained representation in the underlying cases and in this action seeking monetary and injunctive relief.

A jury found Moore practiced law in violation of the State Bar Act (Bus. & Prof. Code, § 6125, SBA), violated the UDAA and the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq., CLRA) and awarded damages of $150 to each of the four plaintiffs. The jury found Moore acted with oppression and malice, but declined to award punitive damages. The trial court issued a judgment on the jury verdicts and a permanent injunction under the unfair competition law (Bus. & Prof. Code, § 17200 et seq., UCL), detailed below. Moore timely filed a notice of appeal. We shall affirm.

## BACKGROUND

"Under the often-enunciated rule, which is so often forgotten in the enthusiasm of advocacy, we look to the evidence accepted by the [fact finder]." (*Findleton v. Taylor* (1962) 208 Cal.App.2d 651, 652 [25 Cal.Rptr. 439]; see *Bancroft-Whitney Co. v. McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].)

Plaintiffs lived in a mobilehome park in French Gulch, Shasta County, and in April 1998 they received unlawful detainer summonses they wanted to fight. None had the means to hire a lawyer and they tried to obtain free legal help.

The Judicial Council form summons for unlawful detainer actions states the recipient has five days to file a response and "If you do not know an attorney, you may call an attorney referral service or a legal aid office (*listed in the phone book*)." (Italics added.)

The Judicial Council information sheet on waiver of court costs states "If you have any questions and cannot afford an attorney, you may wish to consult the legal aid office, legal services office, or lawyer referral service in your county (listed in the yellow pages under 'Attorneys')."

Brockey (who lived with Gayler) looked in his local telephone directory under "Legal Aid" (as instructed on the Judicial Council form) and found a local number which he called. That number was forwarded to Moore's Modesto business. "Jay" told Brockey he had to wire money, which Gayler did because she was able to drive to town to arrange the wire and faxes. Brockey did not tell "Jay" which boxes to check, that he wanted each party to bear its own fees, or that he wanted to raise an affirmative defense by

talking to the judge at the time of trial. Gayler thought they had contacted a law office "that offered services to low income people, [maybe] on a sliding scale of some sort." She called the number on the instructions to clarify them and Moore read the directions to her, rudely ignoring her inquiries. When they filed the papers, the court clerk directed them to the local Legal Services of Northern California (LSNC) office.

Plaintiff Pavloff called "411" information to get the number for free "Legal Aid Services," which he had used before, and was given Moore's number by the operator. He was told to wire $85, which he did. He did not tell "Jay" how to fill out the forms. When he received them he was still unsure what to do so he went to his local LSNC office, and "that was the first time that I knew that this [meaning, Moore's business] wasn't the Legal Aid office that I thought it would be." Plaintiff Word testified to a similar series of events, thinking that "Legal Aid" was a government agency.

The form answers Moore provided to the plaintiffs each have the general denial box checked and add the following purported affirmative defense: "Will discuss with the judge at the time of trial." Each requests that "both [parties] pay their own legal fees." "Parties" is spelled "parteis" on each form.

The plaintiffs had to sign an "agreement & disclosure" form for the "Legal Aid Services Processing Center" in Modesto after paying money but before receiving their answers. The form states that "[t]his office is a professional document preparation and typing service only," that it is not a law office and "will not provide any legal advice." It suggests clients contact an attorney. The forms themselves show that they are sent after payment of money, as each reflects a zero account balance. For example, plaintiff Gayler's form states "Client's deposit is $85.00 with a balance due of $0 for a total of $85.00."

Claudia Nakamura, not a plaintiff herein, testified to a similar set of facts occurring in April 1999. She faced an eviction in Salinas. She thought she was calling the entity which had helped her for free in the past, "the people that help people that don't have the money to pay a regular lawyer." When she asked why she was being charged she was told it was just for the paperwork. She did not see the agreement until after she paid. She did not tell the company how to fill out the form she later received. She was told to attach her own handwritten statement to the answer, but the business *did not offer to type it for her*.

Donna Williams, not a plaintiff herein, also testified to a similar set of facts, except that she did not send money after her "local" telephone call, but

instead went to the local LSNC office. She called "Legal Aid" "Because I've always known Legal Aid to be someone—somebody that helps people that are low income."

Michele Logan, not a plaintiff herein, needed an annulment in December 1999, and called Moore's business, thinking it was "a low income agency" after finding the number under "Legal Aid" in the Modesto telephone directory. After she spent $200 and received the agreement form stating no legal advice was being provided, she felt she had no choice but to sign and return the agreement because it stated her documents were ready and "they cashed the check." When she tried to file the legal papers she was sent, the court clerk told her they were incomplete because she needed service paperwork. She called "Jeff" to complain and he offered to arrange for service by publication for her and said he was an attorney. Logan never received the promised additional paperwork.

Velda Crotty, not a plaintiff herein, wanted help with a grandparent visitation issue and in June 1999 called a local "Legal Aid" number in her Redding telephone book. The man who answered listened to her problem and told her to complete some papers and send them back with $200, that it was a "formality" and in about 30 days it would be finished "and I probably wouldn't even have to go to court." A couple of weeks later she received some forms and a statement that no legal services were provided and she called to inquire. A woman angrily told her that the company was only a typing service.

Donna Pritchard, not a plaintiff herein, needed help with a bankruptcy and had used the real legal aid in the past. She found "Legal Aid" in the Redding telephone directory, called the local number and spoke with a woman who had answered the telephone "Legal Aid." After paying $125, she received incorrect papers and ultimately got in touch with LSNC.

Moore's former employee Michael Isaac testified he was told not to tell callers where the company was, to use aliases, and not to refer callers to the "real" legal aid. Isaac referred to Moore as "Jay" at trial. When Isaac worked there in the fall of 1998, the company received from 60 to 200 calls per day. Isaac was a poor typist and was hired to answer the telephone.

Part of the deposition of Moore's former employee Cynthia Pimental was read to the jury. She worked for Moore from about December 1995 to April 1997. Employees were supposed to use aliases. Callers inquiring about free legal aid were to be told "this is Legal Aid but we do charge[.]" They were to say they were "local" or "in the area" but that the "processing center" was in Modesto. Moore called his employees "players."

Stephen Goldberg, a lawyer for Northern California Lawyers for Civil Justice, a private nonprofit law firm, heard about Moore's business and contacted Moore's Web site in May 1998. He sent an e-mail claiming to be facing an eviction. The reply advised him to "call the Legal Aid Processing Center for document processing and assistance." Goldberg called the 800 number given and "Jay" explained that "his office was the local Legal Aid office mentioned on the [Judicial Council] summons."

Cathy Farrell, the Redding office manager for LSNC, made an audiotape of the voice mail system messages she accessed by calling the "local" number 241-6411 shortly before the trial. LSNC is a nonprofit corporation partly funded by the Legal Services Corporation and grants from government agencies, fundraisers and private charities. At one time the Redding office was called "Legal Aid Society of Shasta County" until it merged.

For about seven years Melinda Brown has been the executive director of People of Progress, a Shasta County organization providing emergency food, clothing and informational referrals to the impoverished. It serves about 8,000 people per year. She has frequently heard LSNC referred to as "Legal Aid," and LSNC is listed as "Legal Aid" on mailings which are sent monthly to food stamp recipients. In her opinion when low-income people refer to "Legal Aid" they mean LSNC or free legal services in general.

After partly granting a request for judicial notice, discussed below, the trial court instructed the jury as follows: "The Judicial Council is the administrative body which [oversees] state courts in California. The Judicial Council issues forms that are used in legal proceedings. When a Judicial Council form refers to consulting an attorney and makes reference to Legal Aid or Legal Services, such as in a summons or the information sheet for waiver of court fees, . . . the reference is to a publicly funded nonprofit law corporation which provides free legal services to low income eligible clients."

Brockey called Moore as an adverse witness, and the jury (and trial court) did not believe Moore's version of events. We will not outline all of the discrepancies and vacillations.

Moore was the owner and manager of "Legal Aid" and "Legal Aid Services" and "Premiere Marketing." He was not a lawyer or paralegal, but claimed to have an attorney (Ernest Elledge) "on staff," though he did not in 1998. If callers ask for legal advice, they are referred to Elledge. Moore's voice mail system directs callers to a 900 number for legal advice, but he claimed he received no income from this service.

Moore used the alias "Jeff Simmons" at Legal Aid. He uses the names "Legal Aid Services" and "Legal Aid" in marketing. He claimed he had a Modesto business license in the name of "Legal Aid Services dash Legal Aid," but later in trial admitted he only had a license in the name of "Premiere Marketing." Still later in trial he claimed he received a business license for Legal Aid and Legal Aid Services the Friday in the middle of trial. He had about 30 listings of "local" numbers around California (e.g., Bakersfield, Los Angeles, Napa, Redding) which would forward calls to his Modesto business. He also used a toll free 800 number but claimed he used the local-forwarded numbers to save money (rather than to deceive callers into thinking they were calling a local legal aid office). He claimed his business typed what people directed on legal forms. Based on the information they provided, Moore would check the various boxes. The same is true for affirmative defenses, "Misspelled words and all. We type their statement, their defense." He does not check the boxes relating to UDAA compliance because he considers himself to be an exempt typing service. However, he did not advertise his business as a "typing service" in the yellow pages, but under "legal clinics." He claimed this was up to the telephone company.

Moore claimed his Web site (legalaidservices.com), which offered "legal documents," would refer to people to lawyers. He claimed it was under construction and not operating, but conceded people could use it, and when people have done so he referred them to lawyers. Although it advertised "Se habla espanol" (under a scales of justice symbol) he no longer had any Spanish-speaking employees. Even though the Web site had a 1997 copyright notice, he claimed it was just under development and had not been operating that long. When confronted in the second week of trial with hard copies of a different version of the Web site, he said he had been working on it for months, but put it online the previous Saturday. He claimed its function was to link people with attorneys in different specialties. The Web site did not have any attorneys "signed up at this point." However, it does list a 900 number.

Among the services offered on the Web site were "bankruptcy" services. Judge Whitney Rimel of the United States Bankruptcy Court for the Eastern District of California, Fresno Division, issued an order in 1999, compelling "Legal Aid Services" to disgorge money to certain debtors and pay sanctions, which Legal Aid Services failed to do. This order also sanctioned Moore for failing to refrain from using the word " 'legal' or any similar term in any advertisements" pursuant to a federal statute regulating bankruptcy petition preparers. (See 11 U.S.C.A. § 110(f)(1).) Moore identified a bankruptcy court judgment he had agreed to recently before trial, finding he " 'continued to prepare bankruptcy documents using the word "legal" in his

business name and advertising'" after the prior order. He claimed LSNC "called the bankruptcy court and sic'd [*sic,* sicced?] them on us[.]" Moore admitted his voice on his company's voice mail system referred to doing bankruptcies, but he claimed the messages were old and the system was different now.

Moore first claimed he had been using his business card since about 1994 or 1995, but when Brockey's counsel pointed out exhibit Q listed Moore's Web site, Moore claimed the card had been changed more recently.

Moore denied requiring employees to use aliases. In deposition he could not remember the names of any employees in 1998, claiming he had "a lot of volunteers."

Moore testified his business was not the "Legal Aid" or "Legal Services" office or "Lawyers Referral Service" referred to in Judicial Council forms.

Moore claimed when customers called, a price was agreed upon, the customers were faxed his written agreement, signed it, then the services were performed. He conceded the forms in evidence for the plaintiffs indicated payment had already been made, but denied that that meant money was collected before the agreement was sent or services provided. He did not save any documents relating to customers until "recently," when Elledge advised him to do so.

Moore testified he operated no other businesses, except that several years in the past he had used a business name of Certified Building Maintenance, or CBM. When recalled later in trial he testified he had no "position" in a company called Belmont Business Corporation, which operated out of the same Modesto building as his business. However, he later conceded he accepted rent checks on behalf of that company. He also testified "Beckwith is kind of a service company that I do research with," but later conceded paychecks for his Legal Aid employees *currently* have the name Beckwith on them.

The jury was instructed on the following deemed admissions: Moore was not registered or bonded under the UDAA, Moore employed no attorneys, and no attorney was responsible for his work. In deposition he testified he destroyed all records, but "we'll start [keeping them] when we leave here [meaning, after the deposition is over.]"

After the jury began deliberating, the parties put on limited additional evidence regarding injunctive relief. In argument, Brockey predicated liability primarily on the UDAA and SBA (which were also before the jury), but

also mentioned the UCL and CLRA; the court wanted to await the jury's verdicts to try to avoid inconsistent rulings. ■ We observe that it is generally proper for a trial court to await a jury's verdict before ruling on overlapping issues being tried to the court. (See, e.g., *Hughes v. Dunlap* (1891) 91 Cal. 385, 388-390 [27 P. 642]; *Posey v. Leavitt* (1991) 229 Cal.App.3d 1236, 1244 [280 Cal.Rptr. 568].)

. Moore was recalled and admitted he was not registered under the UDAA and had not posted the required bond. He claimed he sold "Legal Aid" to Attorney Elledge "Yesterday." He conceded it was an oral agreement "at this point" but was vague on details. He claimed Premiere Marketing "has no relationship to Legal Aid" and he was retaining that business. However, in his deposition Moore had stated he was the owner of "Legal Aid Services" and a marketing company called "Premiere Marketing" was the same thing.

After the verdicts were returned the trial court announced it would issue an injunction because "Moore has really preyed . . . on a vulnerable section of the population by leading people to believe he was Legal Aid, that he was Legal Services, the law service, the law office for the poor. He took advantage of that and had a scheme to continue that belief with people of limited income, dealing with a group of the population that was not likely to challenge his actions because of the relatively low dollar amount of the loss in each case, but dealing in a high volume with respect to the number of clients." The trial court did not specify which statutory violation or violations supported the injunction.

Then the parties briefed the scope of the injunction. Brockey sought an injunction based on *all* of the violations of law proven at the jury trial and court trial. The opposition asserted that Brockey's failure to provide consumer survey evidence on the misleading nature, vel non, of the *advertisements* precluded injunctive relief. It also asserted Moore had transferred his business to Elledge, and that in any event the injunction was overbroad. Attached to the opposition was Elledge's declaration, claiming he had "acquired the typing service known as LEGAL AID SERVICES—LEGAL AID from Walter Moore of Modesto, CA." He then hedged and said "I am in the process of exercising complete management and control" of the business. In reply, Brockey emphasized that the trial evidence showed Moore's business practices were deceptive.

Moore does not faithfully recite the facts supporting the verdict and the injunction in his briefs. Almost none of the above facts are mentioned. ■ Failure to set forth the material evidence on an issue waives a claim of insufficiency of the evidence. (*Foreman & Clark Corp. v. Fallon* (1971) 3

Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) Moreover, what facts are mentioned are skewed in Moore's favor. For example, Moore asserts that the agreement form disclosed that he offered typing services only and not legal services. However, Moore omits to state that this agreement form was sent to clients *after* they had paid the required fees for an unlawful detainer response, and that Moore and his employees, using aliases, routinely induced callers to send money for what was portrayed as legal assistance.

As another example, Moore asserts that the clients were provided with unlawful detainer answers, instructions to file the answers and the statement that further help or legal advice required consultation with an attorney. Moore omits mention of the evidence that he or his employees typed the answers without instructions from the clients, and the fact the responses chosen by them failed to raise any cognizable affirmative defenses. Thus, to the extent Moore implies by his brief that he faithfully provided the services set forth in the agreement (which, as stated above, did not truly reflect the bargain struck by the clients and Moore), the brief misleads.

We deem all of Moore's evidentiary arguments waived. (*Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881.)

DISCUSSION

I.

The judgment recites that the jury found Moore practiced law without a license, violated the UDAA and the CLRA and acted with fraud, oppression or malice. The annexed injunction prohibits Moore in part from using the names "Legal Aid Services" or "Legal Aid" or "Legal Services" "because these three names signify a non-profit law office providing free legal services to low-income persons and families"; using the term "legal" except as a paralegal; and using "local" telephone numbers which forward to his Modesto business. The injunction also requires Moore to change his Web site, tell customers he is not an attorney, place newspaper advertisements regarding this lawsuit and so forth.

The first argument heading in Moore's opening brief asserts "The evidence was insufficient as a matter of law to support the judgment for violations of the [UCL]." He reiterates his claims in an argument about the denial of his directed verdict motion. Brockey replied by correctly pointing out there were several different unlawful practices proven which could support the UCL claim. In the reply brief Moore claims Brockey's brief is mostly irrelevant because Moore only attacked the *false advertising* theory

under Business and Professions Code section 17500. Moore misperceives the import of Brockey's briefing.

The UCL defines "unfair competition" as any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." (Bus. & Prof. Code, § 17200.) It borrows standards of conduct from other statutes, and a plaintiff need only show the violation of any law. (See *Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 519 [63 Cal.Rptr.2d 118].) Another statute specifically makes unlawful advertising services by "untrue or misleading" statements. (Bus. & Prof. Code, § 17500.) A violation of the false advertising law is a violation of the UCL. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 210 [197 Cal.Rptr. 783, 673 P.2d 660].)

Violation of the SBA, CLRA and UDAA, as found by the jury, *and not contested on appeal*, demonstrates that Moore has engaged in a prolonged pattern of unfair business practices, which supports the injunction as issued under the UCL. Part of the instructions on the UDAA theory based liability on the making of "false or misleading statements" (see Bus. & Prof., § 6411, subd. (a)), and part of the instructions on the CLRA theory based liability on misrepresentation of the origin, source, affiliation and quality of services advertised (Civ. Code, § 1770, subd. (a)). Thus, the jury's findings of liability on those theories overlapped with the trial court's finding as to false advertising, regarding the use of "Legal Aid" and similar deceptive phrases by Moore. Therefore, we decline to address Moore's claims regarding false advertising under the UCL because even if we agreed with him the judgment issuing the injunction would be proper based on the unchallenged verdicts on the UDAA and CLRA theories. Wholly apart from advertising, the fact Moore was found by the jury to have given legal advice, rather than acting as a clerical typing service, could support an injunction preventing him from continuing to hold himself out .as a source for "Legal Aid" or "Legal Services" and the like. (See *People v. Landlords Professional Services* (1989) 215 Cal.App.3d 1599, 1603-1604, 1608-1610 [264 Cal.Rptr. 548].)

In the reply brief Moore suggests that if he can eliminate the false advertising prong the case should be remanded for further proceedings, but he does not state what those proceedings would be. For.example, he does not point to any portion of the injunction which depends wholly on the false advertising claim, and we will not make such arguments for him. (*People v. Gidney* (1937) 10 Cal.2d 138, 142-143 [73 P.2d 1186].)

Moreover, Moore's attack on the misleading advertising prong is based on an unfair summary of the evidence, as stated above. Brockey had to show

Moore's business practice is such "that 'members of the public are likely to be deceived.'" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1266-1267 [10 Cal.Rptr.2d 538, 833 P.2d 545] (*Bank of the West*).) "By their breadth the statutes encompass not only those advertisements which have deceived or misled *because* they are untrue, but also those which may be accurate on some level, but will nonetheless tend to mislead or deceive. . . . A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under these sections." (*Day v. AT & T Corp.* (1998) 63 Cal.App.4th 325, 332-333 [74 Cal.Rptr.2d 55].) Tellingly, a plaintiff need not prove that anybody was misled (*id.* at p. 332), although here people were misled.

Moore contends Brockey had to prove "via extrinsic evidence" that his misstatements would likely deceive a reasonable person (not merely a vulnerable person) and that what he terms "anecdotal" evidence, that is, testimony by people that they were in fact misled, is insufficient. He fails to cite a single California case requiring use of survey evidence in unfair business practices cases, only lower federal court cases which are neither binding nor persuasive, to the extent they hold that direct evidence that many people were misled can never show that a reasonable consumer would likely be misled. (See, e.g., *Haskell v. Time, Inc.* (E.D.Cal. 1997) 965 F.Supp. 1398, 1407 ["plaintiff must demonstrate by extrinsic evidence, such as consumer survey evidence, that the challenged statements tend to mislead consumers"].) Generally, those cases involve a very few persons claiming to be misled and do not hold that "anecdotal" evidence can *never* suffice. (See, e.g., *Churchill Village L.L.C v. General Electric Co.* (N.D.Cal. 2000) 169 F.Supp.2d 1119, 1131 [two of 300 recipients].) The Attorney General points out and Moore concedes that these cases have imported into the California UCL standards of proof derived from federal Lanham Act cases, where misleading, rather than false, statements must be shown to have deceived a "significant portion" of the recipients. (See, e.g., *William H. Morris Co. v. Group W, Inc.* (9th Cir. 1995) 66 F.3d 255, relied on in part by *Haskell* and *Churchill*].) We are not persuaded that these cases accurately reflect California law.

Even Moore acknowledges that while evidence of *actual* confusion "*may* be used as evidence of the likelihood of confusion to the general public, a few isolated examples are generally insufficient" and the plaintiff in such cases must show "'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'" But here Brockey proved more than "isolated examples" of people who were actually misled. In this case a number of consumers were actually deceived, and from the

evidence about the enormity of Moore's business and the fact his employees were directed to lie to callers, the trier of fact could conclude Moore's activities were likely to mislead consumers. Further, Brockey had expert testimony that the impoverished in Shasta County equate "Legal Aid" with LSNC or a similar nonprofit law firm. From that fact, and the evidence of actual deception, the trier of fact could conclude deception was likely.

Moreover, we agree with the Attorney General that "the primary evidence in a false advertising case is the advertising itself." The United States Supreme Court has rejected a claim that survey evidence was required in the analogous context of the Federal Trade Commission's regulation of deceptive advertising. (*FTC v. Colgate-Palmolive Co.* (1965) 380 U.S. 374, 391-392 [85 S.Ct. 1035, 1046, 13 L.Ed.2d 904, 918] ["when the Commission finds deception it is also authorized, within the bounds of reason, to infer that the deception will constitute a material factor in a purchaser's decision to buy"]; see *Resort Car Rental System, Inc. v. F. T. C.* (9th Cir. 1975) 518 F.2d 962, 964 [no need to consider objections to consumer testimony because it "merely supported the inferences which can logically be drawn by scrutinizing the advertising alone"].)

In trade name disputes and cases construing California's prior unfair competition law (former Civ. Code, § 3369), the courts acknowledged that the "likelihood of confusion" between names was a factual question, but in some cases "the comparison of the two names themselves may be adequate to establish the likelihood of confusion." (*Ball v. American Trial Lawyers Assn.* (1971) 14 Cal.App.3d 289, 308-309 [92 Cal.Rptr. 228]; see *Hair v. McGuire* (1961) 188 Cal.App.2d 348, 353 [10 Cal.Rptr. 414] [if "a person of ordinary intelligence could reasonably be deceived or confused, that is all that is required"]; *Sun-Maid Raisin Growers v. Mosesian* (1927) 84 Cal.App. 485, 497 [258 P. 630].) In fraudulent misrepresentation cases, ignorant people are not denied recovery so long as they have acted reasonably within the limits of their knowledge; indeed, cheats search for easy marks. (See *Seeger v. Odell* (1941) 18 Cal.2d 409, 414-415 [115 P.2d 977, 136 A.L.R. 1291].) There is no indication the current version of the UCL was meant to depart from these rules.

In our view, the way Moore words his telephone book listings is calculated to mislead and is likely to mislead consumers, as the jury (ruling on the SBA, UDAA and CLRA claims) and the trial court (ruling on false advertising claims) found.

Moreover, where, as here, a statement is targeted at unsophisticated members of the public, it is appropriate to adjust the "reasonable consumer"

standard accordingly. Moore targeted low-income people in need of "legal services," a population that generally is less sophisticated than, say, readers of the San Francisco Daily Journal, a paper targeting lawyers and judges which also provides "legal services" advertisements. Moore relies on federal cases such as *Freeman v. Time, Inc.* (9th Cir. 1995) 68 F.3d 285, but that decision undermines his theory. *Freeman* involved a plaintiff who claimed he was misled by a typical sweepstakes notification into thinking he was a winner, although the notification stated an entrant had to return a "winning" entry. The Ninth Circuit Court of Appeals adopted a rule that the plaintiff in such cases cannot rely on a showing that only some members of the public are likely to be deceived but must show a reasonable consumer must be deceived. But *Freeman* added a significant qualification: " '[U]nless particularly gullible consumers are targeted, a reasonable person may expect others to behave reasonably as well.' [Citations.] In this case, the mailings were sent to millions of persons and there is no allegation that a particularly vulnerable group was targeted." (68 F.3d at p. 289.) The contrary is shown in this case.

At bottom the evidence shows Moore wanted to deceive the public and did deceive them. It is no great stretch—indeed, no stretch at all—to conclude he was *likely* to deceive them.

## II.   *Judicial Notice of "Legal Aid."*

■   Moore contends the trial court erroneously took judicial notice of the meaning of the term "Legal Aid," claiming the trial court took it to mean "synonymous with free legal services to low income persons." Brockey did ask the trial court to judicially notice this broad meaning of "Legal Aid," but the trial court denied that motion. The trial court substantially narrowed the meaning it was willing to accept via judicial notice, and instructed the jury that the use of "Legal Aid or Legal Services," *in Judicial Council forms* refers "to a publicly funded nonprofit law corporation which provides free legal services to low income eligible clients."

Moore contends the trial court abused its discretion because the meaning of "Legal Aid" was in dispute. Moore proffers three points of dispute about the meaning of "Legal Aid," but none of these points, nor all three together, would help him in any way. The disputes are immaterial and therefore the trial court did not abuse its discretion.

First, Moore points out that there was testimony that LSNC was a *private* nonprofit corporation. But Moore's attorney elicited from Goldberg the fact that LSNC is "public[ly] funded." Second, Moore points to testimony that

some people confuse LSNC (which uses the term "Legal Services") and "Legal Aid." Third, Moore objects that only one of the nonparty witnesses testified that she thought "Legal Aid" referred to *free* services. Moore fails to explain how any or all of these disputes were material in the context of this case.

In his prejudice argument, Moore misstates the issue: "The trial court instructed the jury that it '*must accept*' and consider as evidence the judicially noticed fact that 'Legal Aid' means *free* legal services provided by a *public non-profit* corporation. [Citation.] In so doing, the trial court effectively denied Moore his right to a jury trial on a disputed, triable issue of fact."

The trial court did *not* instruct the jury about the meaning of "Legal Aid" for all purposes, only its meaning as used on Judicial Council forms. Moore testified that he was *not* the "Legal Aid" referred to by the forms and therefore we fail to see how the instruction caused prejudice. So far as the meaning *of the forms* was concerned, the matter was not in dispute.

We note that dictionaries and courts define "legal aid" to mean legal services for low-income people. (Black's Law Dict. (5th ed. 1979) p. 803, col. 2; Webster's 3d New Internat. Dict. (1966) p. 1290, col. 2; *In re Brokenbrough* (Bankr. S.D. Ohio 1996) 197 B.R. 839 ["Legal Aid Services" confused people into thinking the for-profit business was the free local Legal Aid Society]; *American Legal Aid, Inc. v. Legal Aid Services, Inc.* (Wyo. 1972) 503 P.2d 1201, 1202.) And we find telling the fact that Attorney Elledge declared that he planned to make a change in the business: "I have elected to eliminate the use of the name LEGAL AID, as that term is used in the Judicial Council forms and is generally associated with free legal assistance underwritten by sponsors of non-profit law corporations and professional offices." We agree.

### III. *Breadth of the Injunction.*

■ The UCL in part provides in part that where a person "has engaged" in unfair competition, "The court may make such orders . . . necessary to prevent the use . . . of any practice which constitutes unfair competition . . . or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." (Bus. & Prof. Code, § 17203.) We have previously recognized that this provision allows trial courts great latitude in protecting the public and making the victims of unfair competition whole. (*Hewlett v. Squaw Valley Ski Corp., supra,* 54 Cal.App.4th at pp. 539-540; see *Cortez v.*

*Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 180 [96 Cal.Rptr.2d 518, 999 P.2d 706]; *Bank of the West, supra,* 2 Cal.4th at p. 1267.)

Moore attacks the injunction on several meritless grounds. He acknowledges the abuse of discretion standard (*California Service Station etc. Assn. v. Union Oil Co.* (1991) 232 Cal.App.3d 44, 56-57 [283 Cal.Rptr. 279]), but simply disagrees with the trial court's findings. We agree with Moore that an injunction must seek to prevent harm, not to punish the wrongdoer.

First, Moore states that he presented evidence he had transferred his business to a licensed attorney. However, the trial court was free to disbelieve that evidence. Moore's evidence on this point was that during trial in this matter he sold his interest to Attorney Elledge, but this was pursuant to an uncompleted oral agreement "at this point." The trial court stated this transaction "could be a sham" or "dodge." Even Elledge's declaration submitted in opposition to the injunction states he is "in the process" of acquiring the business. Elledge had some sort of preexisting employment relationship with Moore. The trial court was not obliged to accept that the transaction was genuine. Moreover, a trial court may issue an injunction where a person has committed a *past* unlawful practice. (See *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 570 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

The rest of the many claims raised suggest alternatives the trial court might have found to be effective, but this does not show the trial court abused its discretion. Moore also asserts, without significant amplification, that various provisions are "punitive." We will briefly address each of the points raised.

Moore suggests the trial court could have allowed him to use "Legal Aid" and similar names, provided he included a disclaimer when prospective clients called, to the effect that he was not *the* "Legal Aid." Such a provision would authorize the use of misleading statements in violation of the law, as the Attorney General points out. It would also be difficult, if not impossible, to monitor. How this would protect the public is not explained in Moore's brief.

In related claims Moore asserts the injunction is overbroad because it bars him from using "Legal Services" and "Legal Aid Services," and he claims these terms were not litigated. In fact, "Legal Services" appears on one of the Judicial Council forms which Moore testified did *not* refer to his business. "Legal Aid Services" also appears in the trial record, for example,

in trial exhibit M, Brockey's demand letter (required by the CLRA, see Civ. Code, § 1782) to Moore. In our view, the trial court could conclude "Legal Aid Services" carried the same likelihood of confusion as "Legal Aid" or "Legal Services." Moore similarly complains that the prohibition on any use of the term "legal" and symbols of scales of justice are "punitive." He did not object to the prohibition on the use of scales in the trial court. Given the evidence of Moore's repeated and intentional efforts to mislead people into thinking he was a lawyer, the trial court could reasonably conclude these provisions were necessary to prevent further acts of consumer fraud. The record also shows that Judge Rimel fined Moore for using the term "legal" in violation of federal law and the record shows Moore continued to violate her orders.

Moore contends the provision requiring him to provide copies of the injunctions to any employees of any of his businesses is punitive because he might choose to open up a business which could not possibly be confused with legal services, e.g., a dry cleaning business. However, there was testimony Moore operated under various names and his evasions on this point no doubt convinced the trial court that this provision was necessary to deter him from opening a business akin to those he had been operating. If, indeed, Moore wishes to open a dry cleaning business, it is difficult to see how he can be harmed by giving his employees copies of this injunction. It would only deter employees of a business that might be covered by the injunction.

Moore complains that he must make compliance reports to Brockey's counsel. He offers no other monitor or method of ensuring compliance and the Attorney General cites other cases in which defendants were ordered to report on compliance. The trial court could conclude Moore was otherwise unlikely to comply with the injunction given his violations of state laws and Judge Rimel's orders.

Moore complains about the requirement that he advertise the injunction in various newspapers (in the communities where he operated the call-for-warded numbers in the yellow pages), and report to Brockey's counsel the names of all persons who responded to the advertisements. Again, this is not a punitive condition, as Moore baldly asserts; it is a necessary mechanism to achieve full disgorgement of Moore's wrongful profits. (See *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 138 & fn. 18 [96 Cal.Rptr.2d 485, 999 P.2d 718].) Isaac testified the company received 60 to 200 calls per day and the trial court thought there might be "thousands" of victims to be located. Moore offers no alternative effective method. Because Moore destroyed business records, there does not seem to be any other practical way to find out the names of his other victims.

Moore does offer a narrower claim: Because the injunction requires his compliance advertisements to tell interested persons to contact LSNC, he complains the requirement that he also notify LSNC of respondents to the advertisement is duplicative. However, the trial court could conclude some defrauded consumers might contact Moore directly instead of LSNC, and the requirement that he report all names responding ensures LSNC will be able to contact such persons as necessary. Moore's claim that quarter-page advertisements are unduly large and expensive does not show an abuse of discretion.

DISPOSITION

The judgment is affirmed.

Sims, Acting P. J., and Davis, J., concurred.