[No. B161491. Second Dist., Div. Five. Dec. 5, 2003.]

CONSUMER ADVOCATES et al., Plaintiffs and Appellants, v. ECHOSTAR SATELLITE CORPORATION et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 5 and 6 under Issues.

1352

**COUNSEL**

Anderson Law Firm and Martin W. Anderson for Plaintiffs and Appellants.

Squire, Sanders & Dempsey, Stephen T. Owens; T. Wade Welch & Associates, T. Wade Welch, Rusty Harrison, Oscar Maldonado, Tommy W. Harrison and Ross W. Wooten for Defendants and Appellants.

**OPINION**

**ARMSTRONG, J.—**

## SUMMARY

This case was brought under the Consumers Legal Remedies Act (CLRA), the False Advertising Act, and the unfair competition law (UCL). The allegations are that defendants, who provide satellite television service, made the following false or misleading statements in their brochure: that the system provided "crystal clear digital video," "CD-quality" audio, and an on-screen program guide which would allow a consumer to view the schedule "up to 7 days in advance," and that 50 channels would be provided.

Under the CLRA, plaintiffs alleged that defendants violated Civil Code section 1770, subdivision (a)(5),(7), and (9), which concern representations that a good or service has characteristics that it does not have or is of a particular standard or quality when it is not, and advertisement of goods or services with intent not to sell them as advertised. The False Advertising Act

claim was that the statements were "untrue or misleading, and which [were] known, or which by the exercise of reasonable care should be known, to be untrue or misleading. . . ." (Bus. & Prof. Code, § 17500.) The UCL claims were that the misrepresentations were unlawful in that they violated the CLRA and the False Advertising Act, and that by making the misrepresentations defendants engaged in fraudulent conduct. (Bus. & Prof. Code, § 17200.) Plaintiffs also alleged that the representations constituted an express warranty, which was breached. They sought class certification on all causes of action, defining the class as persons who acquired defendants' 18-inch satellite system in California.

On the cause of action under the CLRA, plaintiffs sought damages, an injunction, and a restitution order. (Civ. Code, § 1780, subd. (a).) Under the False Advertising Act and the UCL, plaintiffs sought an injunction, an accounting of all profits defendants received as a result of the false advertising or unfair competition, restitution and disgorgement of those amounts, and other remedies. (Bus. & Prof. Code, §§ 17203, 17535.)

The case was decided after the trial court granted the defendants' motion for summary judgment and/or summary adjudication. We find that plaintiffs have not established that the trial court erred insofar as the cause of action for breach of warranty is concerned, but also find that there are triable issues of fact on each of the statutory causes of action. More specifically, we find that there are triable issues of fact on whether defendants violated the statutes with the representations concerning the number of channels and the program schedule. We thus reverse the judgment. The reversal means that the cross-appeal on fees is moot.

FACTS

Plaintiffs are Consumer Advocates and David Pritikin. More specifically, the named plaintiffs on the CLRA and breach of warranty causes of action were Pritikin (and the class), with Pritikin, Consumer Advocates, and the class as plaintiffs on the remaining causes of action. Defendants are Echostar Satellite Corporation, Dish Network, Echostar Communications Corporation and Echosphere Corporation.

Pritikin bought defendants' 18-inch system in November of 1996 and subscribed to a program package called "America's Top 50." At summary judgment, plaintiffs proposed as undisputed that prior to purchasing defendants' system, Pritikin reviewed a brochure, that many copies of the brochure were available at the store, and that the brochure made the representations described in the complaint. Plaintiffs also incorporated by

reference Pritikin's declaration in support of their motion for class certification. A copy of the brochure is attached to that declaration, as are copies of many other of defendants' brochures.

Defendants proposed as undisputed that they provided retailers with a model system so that potential consumers could see a demonstration and that Pritikin viewed such a demonstration before he made his purchase. Plaintiffs did not dispute those facts, but did cite Pritikin's declaration that he looked at the demonstration model for only a few minutes and did not see the problems, which are intermittent, until he installed the system at home.

It was undisputed that the signal consumers received was digital, not analog. It was essentially undisputed, however, that some of the signals to defendants' broadcast center in Wyoming were analog and were converted to digital by defendants.

Defendants proposed numerous facts concerning the quality of the system and customer satisfaction. In sum, those facts were that qualities and features of the product purchased by consumers conformed to the demonstration model, that the majority of consumers believed that the system delivered crystal clear video and CD quality audio, and that consumers were not likely to be deceived by the brochure. In support of these proposed facts, defendants cited the declarations of consumers, retailers, distributors, its own executive vice-president, a marketing expert, and an engineer.

The five consumers declared that they viewed the system before buying one, that the systems they bought were comparable to the demonstration models, that they were satisfied with defendants' service, neither saw nor heard significant defects, were not misled or deceived in any way, and believed that the system provided crystal clear digital video and CD quality audio.

The four retailers and four distributors had each sold or distributed thousands of defendants' system. Each declared that he had never received a customer complaint about the lack of crystal clear video or CD quality audio, or the number of channels, or the on-screen program guide, or about the promotional materials. In addition, each retailer declared that customers interested in satellite systems responded to the demonstration model rather than to written promotional material, which was used at the discretion of the retailer.

Defendants' vice-president, James DeFranco, declared that defendants' written promotional materials are always changing, and that many retailers, particularly in California, rely on demonstrations and their own documents

rather than the brochures. He knew of no customer complaint about the program guide or any complaint that the brochures were misleading. To the contrary, independent organizations including Consumer Reports and J. D. Powers & Associates consistently rated defendants' service as the leader in customer satisfaction.

Bruce Elbert, an engineer with experience in satellite television systems and in designing such systems for consumers, declared that a satellite digital system is higher in quality than an analog signal delivered by cable or a local broadcast. Picture quality depended largely on the quality of the monitor the viewer used. The terms "crystal clear video" and "CD quality audio" are not terms defined by the satellite industry and do not represent a specific quantifiable standard. Further, defendants' marketing materials did not indicate that consumers would receive a perfect image or audio signal.

The marketing expert, Bruce Enis, declared that he had reviewed defendants' brochure and the marketing literature on consumer behavior. He noted that the alleged misrepresentations came under the headings "Dish Network: Nothing Else Compares" and "Dish Network. We Just Love Comparisons," and opined that the representations were part of an overall promotional strategy which invited the public to compare defendants' products to other television services. The typical consumer consulted many sources of information before deciding on a pay TV service, including conversations with friends, but the demonstration was the most important determinant of the purchase decision. Enis opined that the brochure did not promise perfection and was not likely to mislead the public.

Plaintiffs made a variety of evidentiary objections to these facts and proposed facts of their own: The picture produced by defendants' system would frequently become grainy or blocky, a phenomenon called "pixelization," or would freeze ("artifacting") or go black ("blackouts"). On certain occasions, the audio and video were out of sync. Defects in the audio "would occur fairly consistently." Pritikin sometimes heard distortions on certain high-pitched sounds, a phenomenon called "sibilance." Due to these problems, he returned and exchanged his unit several times, and when the problems persisted, spoke to and emailed defendants' technical support representatives. They told him that the problems were introduced when defendants converted analog signal to digital, and/or when defendants added channels to the system, and that everyone who received defendants' service had those problems. Questions about pixelization, artifacting, blackouts, sibilance, etc., were the subject of "frequently asked questions" on defendants' Web site. Pritikin opined that the system did not sound like a compact disc on a store-bought CD player.

It was undisputed that Pritikin continued to use defendants' system. Defendants cited Pritikin's deposition testimony that he switched to satellite television from cable due to problems with cable reception, and that defendants' system was better than cable. Based on Enis's and Elbert's declarations, defendants proposed that Pritikin was not a typical dissatisfied consumer, in that he continued to use the system.[1] Along these lines, Elbert declared that Pritikin's statements showed that he was a "critical viewer," that is, part of the small percent of the population who have an acute sense of vision. The average consumer of satellite broadcasts would not be bothered by the problems Pritikin described.

In response, plaintiffs proposed facts based on Pritikin's declaration that he initially kept his system based on repeated representations from defendants' technical support representatives that the problems would be resolved, and that he replaced the system in an effort to solve the problems. By the time he realized that the problems would not be solved, it was too late to return the system to the retailer. He did not switch to the competitor's system because his home did not have a clear view of their satellite. Pritikin declared that he was a typical, average, reasonable consumer.

As to the on-screen program guide, it was essentially undisputed that the on-screen guide allowed consumers to see the schedule at most only two or three days in advance. Defendants submitted facts based on DeFranco's declaration that the on-screen program guide had the capacity to display a schedule up to seven days in advance, and that "at no time did EchoStar indicate that customers would receive anything but the potential capacity associated with this feature." Nonetheless, in 1997 the statement was removed from defendants' brochures.

As to the number of channels, Pritikin declared that the "America's Top 50" package had only 49 channels. The brochure showed logos for CNN Financial and CNN International, and counted each as a separate channel. In fact, each was only available for a certain number of hours a day, although CNN International broadcasts twenty-four hours a day. Subsequent brochures displayed separate logos for the Independent Film Channel and the Romance Channel, which in fact shared one slot on the (so to speak) dial, so that only one or the other was available at any given time. Plaintiffs also proffered

---

[1] In their brief, defendants also discuss Pritikin's deposition testimony in another case, in apparent support of their position that he was not a typical consumer who wanted television, but was primarily interested in a lawsuit. It is not clear that the deposition testimony was before the trial court at summary judgment. The defendants asked the trial court to take judicial notice of the testimony, which was part of defendants' objections to the request for class certification, but the record does not include a ruling on that request. More to the point, the separate statement does not propose facts based on that declaration, or indeed cite it in any way.

evidence that one of the most frequent requests customers made to defendant was that Independent Film Channel and Romance Channel each be carried full time.

Defendants cited Pritikin's deposition testimony to the effect that the brochure he reviewed included logos for 63 program sources, that he expected to get each of them, that the brochure stated that he would get 50, and that at various times he did get 50.

Finally, it was undisputed that during discovery in this case, defendants sought to inspect Pritikin's system and its installation on his apartment balcony. Plaintiffs refused, citing Pritikin's constitutional right to privacy and right to be free from unreasonable searches.

### The trial court ruling

As to the CLRA, UCL, and False Advertising Act claims, the trial court found that the law required plaintiffs to prove that a reasonable consumer would be likely to be misled, and that they had not done so. The court found that defendants had presented evidence that Pritikin was not a reasonable consumer, finding that a reasonable dissatisfied consumer would not continue to use the system. The court also found that Pritikin's credibility was in question, citing the evidence that Pritikin installed his system himself and would not allow defendants to inspect it in place, and that Pritikin had admitted in his deposition that defendants' system had better picture quality than cable. The court also found that Pritikin had testified differently in his deposition and declaration.

The trial court granted judgment on the cause of action for breach of warranty because "plaintiff has failed to rebut defendants' contention that his complaints concerning satellite transmission are a 'service' and not 'goods.' California Commercial Code section 2105(1)."

### ISSUES

### 1. The Breach of Warranty Cause of Action

Plaintiffs' opening brief on appeal does not address the actual trial court ruling,[2] but instead cites *Keith v. Buchanan* (1985) 173 Cal.App.3d 13 [220 Cal.Rptr. 392], for the proposition that "Statements . . . made in an advertising brochure which is disseminated to the . . . public in order to induce sales can

---

[2] Plaintiffs' reply brief does include some relevant argument, but "Points raised for the first time in a reply brief will not be considered." (*Malmstrom v. Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal.App.3d 299, 320 [231 Cal.Rptr. 820].)

create express warranties." (*Id.* at p. 22.) Plaintiffs have thus given us no reason to disturb the ruling.

### 2. *Civil Code Section 1781, Subdivision (c) and Summary Judgment*

Civil Code section 1781, subdivision (c), part of the CLRA, provides that "If notice of the time and place of the hearing is served upon the other parties at least 10 days prior thereto, the court shall hold a hearing . . . to determine if any of the following apply to the action: . . . (3) The action is without merit or there is no defense to the action. [¶] A motion based upon Section 437c of the Code of Civil Procedure shall not be granted in any action commenced as a class action pursuant to subdivision (a)."

Plaintiffs contend that Civil Code section 1781 thus prohibited the court from granting summary judgment and judgment on the CLRA cause of action. Defendants point out that they moved not only for summary judgment/summary adjudication, but for a motion for a determination that the action was without merit under Civil Code section 1781, subdivision (c)(3). They argue that the judgment was proper as a ruling on the Civil Code motion. Defendants have the better argument.

*Olsen v. Breeze, Inc.* (1996) 48 Cal.App.4th 608, 612 [55 Cal.Rptr.2d 818] held that a no-merit determination under Civil Code section 1781 "provides a means of resolving CLRA actions prior to trial," and affirmed a trial court order dismissing such a cause of action after a no-merit determination. Essentially the same thing happened here, except that the trial court chose to deem the dismissal as one after summary judgment rather than one after a no-merit determination. We can see no meaningful distinction in the choice.

Plaintiffs argue that *Olsen* was wrongly decided, contending that the case ignores Civil Code section 1781's prohibition on summary judgment. We do not see that *Olsen* ignored the statutory language. Instead, that court construed the statute as a whole, reasoning that "In matters of statutory construction our fundamental concern is legislative intent. [Citation.] In order to determine intent, we begin with the language of the provision. [Citation.] Section 1781, subdivision (c)(3) provides a means for determining if '[t]he action is without merit or there is no defense to the action.' This language could not be clearer. Furthermore, section 1781, subdivision (c)(1) already provides a mechanism for determining if the matter is properly maintainable as a class action. Thus plaintiff's interpretation would render section 1781, subdivision (c)(3) superfluous. In matters of statutory construction, an interpretation which renders a provision nugatory should be avoided. [Citation.] Section 1781, subdivision (c)(3) provides a means of resolving CLRA actions prior to trial, as the trial court did in this instance." (*Olsen v. Breeze, Inc., supra,* 48 Cal.App.4th at p. 624.) We find the reasoning sound.

Plaintiffs also argue that *Olsen* was wrong because a dismissal after a no-merits determination would deprive plaintiffs of the due process provided by the summary judgment statute. We are unpersuaded. Plaintiffs point to no due process deprivation here, and it is clear that they suffered none.

The trial court found that the cause of action had no merit and dismissed it. The trial court was entitled to make that decision, and we must review it on the merits.

### 3. *Reasonable Consumer Standard*

This is the standard the trial court adopted for all the statutory causes of action, relying on federal cases. The parties do not contend that in so doing, the trial court erred. Nor do we see error. Instead, we agree with the trial court, and find, in the words of *Lavie v. Procter & Gamble Co.* (2003) 105 Cal.App.4th 496 [129 Cal.Rptr.2d 486], decided after the trial court ruling here, that "unless the advertisement targets a particular disadvantaged or vulnerable group, it is judged by the effect it would have on a reasonable consumer." (*Id.* at pp. 506–507.)

■ And, while *Lavie* considered only the application of the reasonable consumer standard to the UCL and False Advertising Act, we do not hesitate to find that it also applies to the CLRA, which like the UCL concerns "unfair methods of competition and unfair or deceptive acts or practices" (Civ. Code, § 1770, subd. (a), Bus. & Prof. Code, § 17200, *Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647–648 [58 Cal.Rptr.2d 89]), and which is intended "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection" (Civ.Code, § 1760), and which is cumulative to other legal remedies. (Civ. Code, § 1752.)

### 4. *The Representations*

#### *"Digital signal"*

Defendants did not violate any of the statutes with this representation, because it is true. The defendants' system delivered a digital signal to the consumer. Plaintiffs' argument is that the term "digital signal" would mislead a reasonable consumer into believing that the signal was digital from inception to delivery, from cradle to grave. We see no evidence in support of that contention. Pritikin did not even declare that the statement misled *him* into believing that the signal was digital from its inception.

*"Crystal clear" and "CD quality"*

We see no triable issue of fact on whether the representations that the system provided "crystal clear digital" video, or "CD quality" audio constituted misrepresentations about the quality or characteristics of goods or false advertising in violation of the CLRA, or were untrue or misleading under the False Advertising Act or the UCL, or were fraudulent under the UCL.

"Crystal clear" and "CD quality" are not factual representations that a given standard is met. Instead, they are boasts, all-but-meaningless superlatives, similar to the claim that defendants "love comparison," a claim which no reasonable consumer would take as anything more weighty than an advertising slogan.[3] After all, how clear is any given crystal? How good are the speakers on the CD player? The common experience of television watchers since the beginning of television is that no television delivery system is perfect. Broadcast is subject to interference and reception problems. Cable goes out, usually at inconvenient times. Satellite systems, as plaintiffs have demonstrated, have their own problems.

Defendants produced evidence that consumers who bought the system did not believe that they were deceived, or that the brochures (if they read them) included false or misleading information about the video or audio quality, but instead found that the system was a good one, or a good-enough one, despite some problems. Plaintiffs argue that some consumers might not even know that they have been deceived, but the argument is clearly wrong. Once a consumer has the system in use at home, any misrepresentations in the brochure would be revealed. The lack of complaints and returns is thus highly relevant.

Plaintiffs relied on Pritikin's declaration, which was in effect that there were problems with both audio and video, and that defendants knew about the problems. That would be enough if the issue was whether the system ever experienced problems, or was less than perfect, but that is not the issue. Neither "crystal clear" nor "CD quality" can reasonably be understood as a promise of perfection.

*"50 channels" and "7 day schedule"*

In contrast, these are factual representations. Moreover, we find that there is a triable issue of fact on the relevant point, whether these representations

---

[3] The statements are akin to "mere puffing," which under long-standing law cannot support liability in tort. (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 111 [120 Cal.Rptr. 681, 534 P.2d 377].)

are likely to deceive a reasonable consumer.[4] ■ In so holding, we reject defendants' view that a plaintiff must produce a consumer survey or similar extrinsic evidence to prevail on a claim that the public is likely to be misled by a representation. (*Haskell v. Time, Inc.* (E.D.Cal.1994) 857 F.Supp. 1392.) Instead, "The falsity of . . . advertising claims may be established by testing, scientific literature, or anecdotal evidence." (*National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc.* (2003) 107 Cal.App.4th 1336, 1348 [133 Cal.Rptr.2d 207].) Federal cases holding otherwise do not accurately reflect California law. (*Brockey v. Moore* (2003) 107 Cal.App.4th 86, 99 [131 Cal.Rptr.2d 746].)

■ Defendants' argument on these representations is that the statement that the consumer would receive 50 channels was not a statement that all 50 channels would be available at all times, and that the statement about the program schedule only meant that the system had the *capacity* to show the schedule seven days in advance. Those are possible, if technical, interpretations of the statements, but we cannot say that there is no triable issue on whether they were untrue or misleading. Under the False Advertising Act and the UCL, "A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable." (*Day v. AT&T Corp.* (1998) 63 Cal.App.4th 325, 332–333 [74 Cal.Rptr.2d 55].)

5., 6.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment in favor of defendants is reversed, as is the grant of summary judgment, except that we affirm summary adjudication on the cause of action for breach of warranty. The cross-appeal is dismissed. The parties are to bear their own costs on appeal.

Turner, P. J., and Mosk, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied March 24, 2004.

---

[4] To put it another way, as to the CLRA cause of action, we find that the trial court erred in finding that the cause of action had no merit.

*See footnote, *ante*, page 1351.