Filed 10/15/13  Scott v. West Air CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| STEVEN G. SCOTT,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>WEST AIR, INC.,<br><br>Defendant and Respondent. | B242436<br><br>(Los Angeles County<br>Super. Ct. No. BC451697) |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Ralph W. Dau, Judge.  Affirmed.

Law Office of Doug Griffith and Doug Griffith for Plaintiff and Appellant.

Ballard Spahr, Naomi Young and John R. Carrigan, Jr. for Defendant and Respondent.

————————————

# INTRODUCTION

Plaintiff Steven G. Scott appeals from a judgment in favor of defendant West Air, Inc. entered after a jury trial in this action for wrongful termination and breach of employment contract. He also appeals from a postjudgment order denying his motion for judgment notwithstanding the verdict. On appeal Scott claims instructional error and challenges the sufficiency of the evidence to support the jury's verdict. We affirm.

# FACTUAL BACKGROUND[1]

## A. *West Air and Its Training Procedures*

West Air is a cargo airline that operates solely for Federal Express. After Federal Express flies cargo to large cities in large planes, West Air flies the cargo to smaller cities in smaller planes. West Air uses the Cessna Caravan, model 208B, a single turbine engine plane that carries one pilot and about 3,000 pounds of cargo. The planes are not pressurized, so no oxygen is pumped into the plane, and the pilots use a breathing apparatus called an EROS oxygen mask for oxygen.

West Air's training program for new pilots consists of about three weeks of different types of training. The first week is ground school, basic training in a classroom at the West Air facility in Fresno. West Air trains the new pilots on the West Air operations manual, company policies and procedures, federal regulations, and other matters. Then there is a five-day training course specific to the Cessna Caravan in Wichita, Kansas. This course includes both ground school and time in a flight simulator.

---

[1] "We state the facts in the light most favorable to the jury's verdict, resolving all conflicts and indulging all reasonable inferences to support the judgment." (*Green Wood Industrial Co. v. Forceman Internat. Development Group, Inc.* (2007) 156 Cal.App.4th 766, 770, fn. 2; see *Monroy v. City of Los Angeles* (2008) 164 Cal.App.4th 248, 252, fn. 1 ["[f]ollowing the usual rules on appeal after a trial on the merits, we construe the facts, including all conflicting facts, in the light most favorable to the verdict"].)

The pilot then returns to Fresno for flight instructions and a check ride. Once the pilot passes the check ride, there is a week of Initial Operating Experience (IOE) training. This allows West Air to observe the pilot and allows the pilot to become comfortable with West Air's policies and procedures.

B. *Scott's Employment with and Initial Training by West Air*

On June 28, 2010 Scott accepted employment with West Air. On July 6, 2010 he signed an acknowledgment that he had received the West Air Associate Handbook. The Handbook specifies that employment by West Air is at-will, and that the employment relationship may be terminated "at any time, with or without notice, and with or without cause." The Handbook discusses performance evaluations and notes that positive performance evaluations do not "alter the employment at-will relationship." The Handbook contains a section on good conduct guidelines, discussing potential forms of discipline for violation of rules and guidelines, and notes that West Air "reserves the right to terminate employment with or without cause and with or without notice." The Handbook also requires employees to make safety complaints when they become aware of safety issues and promises that West Air will not take any kind of adverse action or retaliate against employees who make safety complaints. Other West Air documents also encourage safety complaints and provide that West Air will not retaliate against employees who make safety complaints.

Scott attended ground school on July 6, 7, and 8, 2010. Thomas Jordan, West Air's Vice-President of Flight Operations, was Scott's instructor for most of ground school. Jordan told Beth Wood, West Air's president and chief operating officer, that Scott frequently interrupted the training sessions and that Jordan had to remind Scott to listen and learn rather than to share his personal experiences. Scott's interruptions made it difficult to keep the training on track. Scott also completed his Cessna Caravan training in Wichita.

On July 20, 21, and 22, 2010 John Matthews, the chief pilot for West Air, provided Scott with two days of flight instruction training and gave Scott a check ride.

3

Matthews noted one issue during the check ride on Scott's training record but Matthews did not report it to Jordan. After some retraining on the simulator, Matthews certified that Scott was approved to fly.

Scott began his IOE training on July 27, 2010. On July 30, Scott was scheduled to fly with pilot Dale Kienholz from Ontario to Bakersfield. Kienholz reported to Jordan that the flight was late departing from Ontario. While there were some issues with loading the plane and the global positioning system (GPS), the plane was ready for departure within two minutes of the scheduled departure time. Scott took an additional 10 minutes, however, to move the plane off the ramp, rather than the two to three minutes it should take. The delay required a report from West Air to FedEx explaining the circumstances surrounding the delay.

After speaking with Kienholz, Jordan spoke to Kyle Samis, a training officer who had flown with Scott earlier in the week. Jordan wanted to get Samis' opinion on Scott's performance. Samis reported that Scott seemed somewhat overwhelmed and was initially resistant to assistance from Samis. Samis testified that Scott "was somehow unable or unwilling to prioritize the preflight duties as the aircraft was getting loaded." Samis tried to "refocus [Scott's] attention" but felt that Scott was becoming "frustrated" with Samis. During the flight, Samis noticed Scott "was completely fixated on GPS" and was not paying attention to what was happening outside the plane, such as whether there were other aircraft. As they approached the Santa Maria airport for landing, there was a "blanket of fog," requiring an "instrument approach." Samis noticed that Scott was not taking any of the steps necessary to prepare for the landing and offered assistance. Scott "was very adamant that he could do it himself" and his responses to Samis' offers of help reflected irritation and even belligerence. Samis finally insisted on helping and the plane landed safely. Afterwards, Scott acknowledged his mistakes and that his performance needed improvement.

Based on the reports from Kienholz and Samis, Jordan was not comfortable releasing Scott for service and wanted him to have an additional week of IOE training. He assigned Matthews to provide training on the Ontario-Bishop-Inyokern route.

4

C.  *Problems During Scott's Second Week of IOE Training*

1.  August 2 and 3, 2010

On Monday, August 2 Scott drove to Inyokern, where he met Matthews. Matthews intended that Scott fly the plane, but Scott said he wanted to observe, so Matthews flew the run to Bishop, then to Inyokern, then to Ontario. There were no problems during the flight.

On Tuesday, August 3 they flew the same route. Scott testified that there were no problems on the flights to Bishop or Inyokern. On the flight to Ontario, however, it seemed to Scott that Matthews confused the altimeter with the transponder, although Scott "didn't think much of it" at the time. Then Matthews wanted to turn east, but the controller was concerned that Mathews was going to turn into the restricted airspace at Edwards Air Force Base. According to Scott, the controller was giving Matthews instructions "almost as though he was a student pilot." Scott testified: "So I was like— just, like, minding my own business. I was listening to [the conversation between Matthews and the controller], but I knew we were okay where we were sitting. And I knew where to turn, but I'm not going to intervene on the chief pilot's flight, that's for sure. Not going to tell him what to do." Scott believed that Matthews was experiencing "a little bit of confusion" and did not "know why he was having difficulty." Scott noted that Matthews "chose to fly at 11,500 feet, which [Scott] thought was a little on the high side. But he's pilot in command. He can choose whatever altitude he wants."

As they approached Ontario, Matthews requested his instrument flight rules clearance. The controller gave Matthews instructions on how to go to Ontario and cleared him to descend to 10,000 feet. Scott was "just sitting there minding my own business and observing like I was told. And [Matthews] stayed at 11,000 feet for quite a long time. So I'm a little reluctant to coach my chief pilot, but at one point I said, 'Hey, John, you are cleared.'" Matthews acknowledged Scott was correct and descended to 10,000 feet. Matthews seemed to have trouble turning onto the airway and descending. When the speed of the plane was too high, Scott cautioned Matthews to slow down. Scott was wondering what was wrong with Matthews. He thought, "I shouldn't have to

5

intervene. I'm just a passenger, not even a required crew member." As they neared the airport, Scott was wondering when Matthews was going to call the tower. "So before it got to be critical," Scott told Matthews to call the tower, but Matthews did not do so. Scott was wondering if he needed to intervene, "[b]ut there were no aircraft in the way. He seemed to be controlling the airplane okay. So I said [to myself], 'There's no imminent danger of a crash or a collision.' So I just said, 'You got to call the tower.' He did."

Scott testified that once they landed the controller asked if Matthews saw his light gun signal,[2] and Matthews said he did not. When they got out of the plane, Scott asked Matthews if he felt all right. Matthews said he did and asked why Scott had asked. Scott asked why he did not call the tower, and Matthews asked what Scott meant. Scott suggested that Matthews might be impaired by hypoxia, lack of or insufficient oxygen in the brain (*Vecchione v. Carlin* (1980) 111 Cal.App.3d 351, 354), and Matthews responded, "I forbid you to use the word 'impaired.'" Scott suggested that if Matthews had been using a nasal cannula[3] he would not be suffering from hypoxia.[4] Matthews

---

[2] Scott explained that "[a] light gun signal is a discrete, very focused beam they point at an airplane in flight so that they can communicate with you in the event that there's a problem with communication."

[3] "The nasal cannula has been a commonly used . . . interface to provide supplemental oxygen since its introduction in the 1940s." (Ward, *High-Flow Oxygen Administration by Nasal Cannula for Adult and Perinatal Patients* (Jan. 2013) Respiratory Care <http://rc.rcjournal.com/content/58/1/98.full.pdf.html> [as of September 25, 2013].) It supplies oxygen through tubes into the nostrils.

[4] On cross-examination, Scott acknowledged the EROS oxygen mask with which the plane was equipped could have been used to prevent hypoxia and that he suggested a nasal cannula as "an alternative." He went on to explain that the cannula was a better alternative because the EROS mask did not fit well over his glasses and headset, and "the oxygen coming in from the tank would be super-heated from sitting in the sun, so your whole face would be enveloped in 130 degree air with no way to wipe away the sweat." Matthews testified that the EROS mask fit comfortably over glasses and a headset, and that Scott had not complained about the mask during training. Both Jordan and Boyd

became angry and said something to the effect that if Scott did not like how the plane was equipped, he should not fly it.

Matthews testified that he did not confuse the altimeter with the transponder. He acknowledged that the controller told him about the boundaries of the restricted area, but he did not know why. He knew how to navigate around the restricted area and had done it many times. He also denied exceeding the maximum permissible airspeed during his descent into Ontario. Matthews testified that as they neared Ontario, he had not received the final clearance to land or been switched—"given the hand-off"—to the control tower radio frequency. Matthews noted "the unusually late switch to tower" is something that "happens more often than you might think." As he was switching frequency, Scott told him they did not have clearance to land. The tower had been attempting to reach Matthews to let him know he had clearance, and as soon as he was switched to tower frequency he heard that he had clearance. Matthews did not remember the control tower asking him if he had seen the light gun signal. Matthews explained that because he had clearance to land, the light gun signal "wasn't any big deal." In addition, in order to see the light gun signal, he "would have to be looking directly at the tower." According to Matthews, it was the following morning that Scott suggested that Matthews had been impaired on the August 3 flight.

Pierce checked the flight data recorder for the August 3, 2010 flight. It showed that the maximum airspeed the plane reached on the third leg of the route was 160.48 knots; the maximum airspeed for the plane was 175 knots.

A recording of the control tower's communication with Matthews indicated that the tower had given Matthews clearance to land. Scott acknowledged that he later learned this was the case.

---

Pierce, West Air's Director of Maintenance, testified that they had used the mask during flights and had never experienced oxygen coming through the mask at 130 degrees.

2.    August 4, 2010

Matthews asked Scott to come in at 5:00 a.m. the following morning so they could get an early start on their preflight activities, including completing their paperwork and making sure the plane was ready to fly.  Scott arrived 20 minutes late.  When Matthews asked why he was late, Scott said he was tired and was trying to catch up on his rest.[5]  During their conversation Scott began discussing "density altitudes" and how they were flying dehydrated, fatigued, and impaired.[6]  He also said he was feeling ill.  Matthews told Scott that he was welcome to call in sick and they could continue the training the following day.  Scott refused and said he would fly the plane but not alone.  Matthews reminded Scott that Scott was not assigned to fly by himself.  Matthews also "reminded [Scott] of the repeated mistakes that he was making, and that he needed to stop interrupting [Matthews] when [Matthews] was giving him instruction and to listen up."  Matthews "was trying to get some things across to him so that he could take the flights by himself."

During the flight, Scott complained about the planes.  He did not like the fact that the Cessna Caravan did not have an altitude alert or a flight management system, which, Matthews explained, only jet aircrafts usually had.  Scott also complained about the seats and about the difficulty of getting in and out of the plane.  Scott again mentioned the nasal cannula and said that he felt they should be able to remove the EROS mask and use

[5]    Scott initially testified that he arrived on time at 5:00 a.m.  When confronted with his deposition testimony that he arrived 15 minutes later than the time Matthews had "suggested" that he arrive, Scott testified:  "I was there at the point in time he suggested, I just wasn't in the same location in the airport.  I was checking on modems and using the bathroom, and I didn't realize he wanted me on the tarmac at that point."

[6]    According to Matthews, a pilot's need for oxygen is determined by "altitude above mean sea level," not "density altitude," and Scott should have known that.  Scott also made incorrect statements regarding the plane's performance.  Because Scott had received training on flight safety in the Cessna Caravan, Matthews wondered why he did not know about the plane's performance.  Matthews also testified that he had not observed that Scott was impaired while they were flying together.

8

a cannula. Matthews testified that the cannula is mainly used for sport flying, would not be safe in case of fire, and is only good up to 18,000 feet, while the Cessna Caravan is certified up to 25,000 feet. When Scott again brought up the cannula, Matthews told him the system installed on the planes was more than adequate.

Scott flew the same route that Matthews had flown on August 3. He testified that there were no problems with airspeed and he did not feel the plane was going too fast. According to Pierce, however, the flight data recorder showed the maximum airspeed on the third leg of the route was 168.36 knots, which was faster than the maximum airspeed the previous day.

By the end of the day, Scott had not mentioned to anyone at West Air anything about the events of the previous day involving Matthews. He testified, "That was our secret."

### D. *Scott's Termination*

#### 1. Scott's Conversation with Jordan

Scott was scheduled to fly with Matthews again the following day, August 5, 2010. When he arrived, Matthews asked how he was doing. Scott said he was fatigued, still dehydrated, and had not caught up on his rest. Scott "forcibly" told Matthews, "I want my cannula." Matthews again told Scott that the EROS oxygen system was "more than adequate," and Scott responded, "Well, it doesn't fit over my glasses." Matthews "could see that [Scott] really wasn't in a very good mood. He just seemed belligerent to me. This was no place for him to be flying with me in the . . . mood he was in. There was just no way I was going to fly with him that day, and I wasn't going to send him out on a flight also by himself." Matthews "had doubts whether or not [Scott] would use that oxygen equipment if he ever needed it, because he had told me before, he didn't like it. He wanted his thing. He wanted it his way." Matthews felt he could not fly with Scott because "it was a safety issue." "You don't go out and start a flight in a bad mood, especially with another crew member. It's just not good policy."

9

Matthews told Scott that things were not going to work out. He said, "If this equipment is not good enough for you, I want you to go home. When you go home, call Mr. Jordan." Matthews wanted Scott and Jordan "to see if they can come to some sort of agreement if [Scott] was going to use this piece of equipment as we supplied or not." Scott asked Matthews if he was fired. Matthews "told him no." Matthews spoke to Jordan because he thought Jordan should know about the "issues" with Scott.

Scott called Jordan at about 9:30 a.m. Scott told Jordan about what he had observed on the August 3 flight. According to Scott, Jordan's "response was that I should have done more to intervene, and I took it he was blaming me for the incident." Scott said the problems on the flight were caused by hypoxia and asked, "In order to prevent this problem from happening in the future, is it possible we could get cannulas in the airplane?" Jordan asked why Scott could not use the masks that were installed in the plane. Scott responded, "It's a compatibility issue. It's very difficult to wear the headset, the mask, sunglasses, and drink water at the same time."

Jordan testified that he asked Scott "if he knew that [the] aircraft did not have a clearance to land why didn't he do anything to make the pilot flying aware of it?" Scott responded "that he didn't feel it was his position to correct the chief pilot." Jordan checked with Matthews, who assured him that he had clearance to land. Jordan was concerned because "[w]hen you got two people in a cockpit, it's everybody's responsibility to report anything that looks like it's going to be unsafe or illegal in the flight." Scott had a background in aviation safety, and he should have been aware of that. Jordan thought Scott made "a very poor decision" when he chose not to intervene even though he believed the plane did not have clearance to land. "And if he would just sit, allowing that aircraft to potentially land on top of another aircraft that didn't have clearance to land, I just did not have any need for him operating our aircraft."

Jordan was "frustrated with the conversation" with Scott. He explained that "Scott brought up several areas of concern that concerned him safety-wise. My concern was that the situations were self-inflicted, and he was rejecting any kind of training or guidance I was giving him to mitigate these issues." For example, when Scott

10

complained about not having a nasal cannula for flight at higher altitudes, Jordan suggested flying at a lower altitude. Scott complained that it was too hot at lower altitudes, which caused problems with dehydration. He would then need to drink water to avoid dehydration, but doing so would cause him to feel "the need to relieve himself, and he was concerned about being distracted by the end of the flight." Jordan "suggested the use of a portable relief container," but Scott expressed his concern that the airplanes did not have restrooms on them. Jordan testified that even if the planes had restrooms, the pilots would be unable to use them because they had to remain in their seats to fly the plane. Scott also complained that West Air provided no training "in the performance of the aircraft, and also made the statement that when he was flying the jet he always knew what to expect out of that aircraft performance-wise. [Jordan] reminded him that we do have an aircraft flight training manual, and training was received in it" at Cessna Caravan training in Wichita.

According to Scott, his conversation with Jordan "ended when—I explained to him that I was composing an e-mail, answering his questions. And . . . we talked about all the factors, the physiological factors and the possible solutions for that. He said, 'Okay. Put it all in writing. Put it all down, whatever you think, and send me the e-mail.'" Later that morning, Scott sent an email to Jordan reiterating his suggestion that a nasal cannula be provided and his complaints about dehydration and reduced rest caused by the flight schedules. Scott concluded: "The issues i've [sic] outlined above are not only cumulative but compounding. I have felt the effects of these factors and witnessed the effects on my training Captain. As we all will agree operating any type of equipment while impaired by any factor must be avoided. Mitigating any of these issues will yeild [sic] a plot [sic] that that is less error prone and when faced with an emergency situation will be better able to make the decisions required by an unusual situation. [¶] My only intrest [sic] is increasing the safety margins while flying for West Air."

11

2.      The Decision To Terminate Scott

Later that morning, Jordan told Wood about his conversation with Scott. Wood was aware of the problems Jordan had experienced with Scott during ground school and that Scott had been late for a flight on July 30. When Jordan spoke to Wood on August 5, "he relayed to [her] all the events and the things that were causing him so much frustration. It was after the discussion that [they] came to the determination that it was probably best to terminate Mr. Scott."

Wood explained there were several issues that led to her decision that West Air should terminate Scott. One "was being late for work twice in a row." Timeliness was important to Federal Express. Wood also "was concerned that there were no solutions that we could offer to help Mr. Scott out with the issues he was experiencing himself. Other pilots don't expect me to fix their dehydration issues. [In addition], we provide them [with] a hotel to let them get some rest during the day. They are home at night, they can get some rest during the day. I can't help Mr. Scott get some sleep so he doesn't feel fatigued."

Wood also was concerned that "we had just spent the last four weeks training Mr. Scott, sending him to a school that cost several thousands of dollars, and at the end of that four weeks it appeared he made no further progress in understanding how to fly that particular airplane. He didn't know how to find the performance data, which is in every airplane manual in exactly the same location." Scott's performance during IOE training was also a concern, "because we felt if Mr. Scott wanted to work for us, and cooperate with us, and come to some solutions, it would have been so much more helpful. But he constantly interfered with the training experience. He was not receptive to guidance, and training, and experience and learning." When asked whether she considered Scott's "comments to be complaints about unsafe conditions at West Air," Wood responded that she did not. Rather, "[t]hose were comfort issues." She also denied recommending his termination "because he made safety complaints or complaints about unsafe conditions."

After Wood recommended Scott's termination, Jordan gave the matter further consideration. He testified, "I went back to my office, drafted notes of our conversation,

12

looked back at our past history on how we handled other IOE issues." He ultimately decided to terminate Scott.

Jordan drafted a notice of termination stating that West Air was terminating Scott "because I feel that you are not ready to assume the responsibility of Pilot in Command of our aircraft even though we have spent additional training time with you. While you have demonstrated competency in operating the aircraft, you have not been able to demonstrate the level of reliability, procedural knowledge or decision-making skills that we and our customer expect from our flight crews." Jordan noted that Scott was late for work twice and did not call to notify the company that he would be late. West Air's "system is time-critical and we have absolutely no tolerance for one that would ignore or disregard our requirement for punctuality." Jordan acknowledged Scott's areas of concern but pointed out that "[f]or each area of concern you mentioned, I offered one or more solutions for mitigating the situation. You became argumentative and defensive and stated that our equipment was unsuitable for your use e.g., oxygen masks, and aircraft performance. You also appear to be unable to mitigate issues on your own and require someone else to offer solutions." Jordan concluded by stating that West Air had offered Scott "more training or supervision than what is normally required but I am unwilling to offer any additional time to a person who would argue with me or constantly interrupt while I am offering this additional training or discussion. I have no tolerance for this kind of behavior as it is detrimental to the learning that should be taking place."

## PROCEDURAL BACKGROUND

Scott filed this action on December 21, 2010, alleging causes of action for retaliation in violation of Labor Code section 6310, retaliation in violation of Labor Code section 1102.5, wrongful termination in violation of public policy, breach of employment contract, defamation, and intentional infliction of emotional distress. After the trial court granted West Air's motion for summary adjudication, the parties went to trial on the remaining causes of action, retaliation in violation of Labor Code section 6310 and

13

breach of employment contract. The jury found in favor of West Air on both causes of action and the trial court entered judgment in favor of West Air.

Scott then moved for judgment notwithstanding the verdict and a new trial on the grounds that the evidence supported a judgment in his favor, and that he was entitled to a new trial because the trial court had erroneously instructed the jury. The trial court denied both motions. Scott timely appealed.

## DISCUSSION

A. *Standard of Review*

"'Actions for [wrongful termination] and retaliation are inherently fact-driven, and we recognize that it is the jury, and not the appellate court, that is charged with the obligation of determining the facts. Nonetheless, the jury's verdict stands only if it is supported by substantial evidence.'" (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1218.) In applying the substantial evidence standard, we "must review the whole record to determine whether it supports the judgment. [Citation.] [We] may not confine [our] consideration to isolated bits of evidence. [Citation.]" (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 840; see *Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1106.) We "view the evidence in the light most favorable to the judgment and presume in its support the existence of every fact the trier could reasonably deduce from the evidence." (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 965, fn. 3; see *Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726, 736.) Substantial evidence "'"'must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' [Citations.]"'" (*Joaquin*, *supra*, at p. 1219; accord, *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 966-967.)

In addition, "although an inference can serve as substantial evidence for a [judgment], '"the inference must be a reasonable conclusion from the evidence and

14

cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork.  [Citation.]  Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record.  [Citation.]"  [Citation.]  "[A] trier of fact may not indulge in inferences rebutted by clear, positive and uncontradicted evidence.'" [Citation.]"  (*Shandralina G. v. Homonchuk* (2007) 147 Cal.App.4th 395, 411; see also *California Assn. of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286, 308; *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389-390.)

We also "'must start with the presumption that the record contains evidence sufficient to support the judgment; it is the appellant's burden to demonstrate otherwise.'"  (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1322, fn. 18; accord, *Bell v. H.F. Cox, Inc.* (2012) 209 Cal.App.4th 62, 80.)  The appellant must set forth all the material evidence, both ""'"favorable and unfavorable, and show how and why it is insufficient."'""  (*Overhill Farms, Inc. v. Lopez* (2010) 190 Cal.App.4th 1248, 1268, italics omitted.)  The appellant must also "faithfully recite the facts supporting the verdict" (*Brockey v. Moore* (2003) 107 Cal.App.4th 86, 96), supporting each factual reference with an appropriate citation to the record (see *Hernandez v. Vitamin Shoppe Industries Inc.* (2009) 174 Cal.App.4th 1441, 1453; Cal. Rules of Court, rule 8.204(a)(1)(C)).  Failure to set forth the evidence in the record accurately forfeits on appeal the challenge to the sufficiency of the evidence.  (*Clark v. Superior Court* (2011) 196 Cal.App.4th 37, 52; *Brockey v. Moore*, *supra*, at p. 96.)

To the extent "the appeal involves issues relating to [the] jury instructions, and the prejudicial effect of any such error," ""'"[w]e do not view the evidence in the light most favorable to the successful [party] and draw all inferences in favor of the judgment. Rather, we must assume that the jury, had it been given proper instructions, might have drawn different inferences more favorable to the losing [party] and rendered a verdict in [that party's] favor on those issues as to which it was misdirected.  [Citations.]'" [Citation.]  So, 'we recite the facts in the light most favorable to the claim of instructional error [citations] and we assume the jury might have believed [the losing party's] version

15

of the facts . . . [citations].' [Citation.]" (*Veronese v. Lucasfilm Ltd.* (2012) 212 Cal.App.4th 1, 4-5.)

B. *Wrongful Termination Instruction*

Scott argues that the instruction on wrongful termination erroneously required him to prove an actual unsafe working condition as opposed to a perceived unsafe working condition. We find nothing wrong with the instruction.

Labor Code section 6310, subdivision (a)(1), provides: "No person shall discharge or in any manner discriminate against any employee because the employee has . . . [¶] . . . [m]ade any oral or written complaint to the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, his or her employer, or his or her representative." Subdivision (b) provides a cause of action to "[a]ny employee who is discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because the employee has made a bona fide oral or written complaint to the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, his or her employer, or his or her representative, of unsafe working conditions . . . ." (See *Cabesuela v. Browning-Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101, 109.)

The trial court instructed the jury: "Mr. Scott also claims West Air discharged him from employment for reasons that violate a public policy. To establish this claim, which is called 'wrongful termination in violation of public policy,' Mr. Scott must prove all of the following: one, that Mr. Scott made a complaint to West Air of unsafe working conditions; two, that Mr. Scott made his complaint in good faith; 3, that West Air discharged Mr. Scott; 4, that Mr. Scott's complaint was a motivating reason for his discharge; and, 5, that the discharge caused Mr. Scott harm." (See CACI No. 2430.)

In closing argument, counsel for West Air read this instruction to the jury and then told the jurors that she wanted them to focus on the issue of unsafe working conditions.

16

She stated, "While Mr. Scott may argue to you that he made a safety complaint, there is no evidence that any unsafe working condition existed at West Air. No evidence of an unsafe working condition. And Mr. Scott has the burden of proving to you that there was an unsafe working condition. Not one of the issues raised by Mr. Scott implicates an unsafe working condition. And I'm going to work through every one of them with you, including the one about going to [the] bathroom, including fatigue, including about, 'I don't understand how the aircraft performs.'"

At this point, Scott's counsel objected. In a sidebar conference he explained: "I believe that counsel is now giving an instruction about the law. It's not the same as my understanding of what the court was instructing about the law. [Counsel] seems to be saying that according to the court's instruction we have to prove that there actually did exist an unsafe working condition. My understanding is that we just have to prove the complaint was of something that he thought was unsafe. This is exactly what my concern was when we were talking about the language of the instruction. I don't think that the court meant that he actually has to prove there was an unsafe working [condition]." The trial court responded: "So this was covered when I read the instructions to the jury. She is now arguing to them. I told them that if the lawyers say anything different, they follow my instruction. Overruled."

Counsel for West Air continued with her argument that "not one of the issues raised by Mr. Scott implicated an unsafe working condition. Instead, the matters raised by Mr. Scott implicated, as I said when I started, issues of personal responsibility of a professional airplane pilot, and matters that implicated issues of personal comfort and personal preference." After reviewing those issues, she stated that the evidence showed "that whatever issues Mr. Scott had with the EROS mask, and supplemental oxygen, fatigue, dehydration or training, to use Mr. Jordan's words, they were 'self-inflicted.' They were not issues amounting to unsafe working conditions at West Air."

Scott is correct that Labor Code section 6310 does not require that working conditions actually were unsafe. Under section 6310, "'an employee is protected against discharge or discrimination for complaining *in good faith* about working conditions or

17

practices which he reasonably believes to be unsafe, whether or not there exists at the time of the complaint an OSHA standard or order which is being violated.' [Citation.]" (*Cabesuela v. Browning-Ferris Industries of California, Inc.*, *supra*, 68 Cal.App.4th at p. 109.) Nothing in the instruction given by the trial court, however, stated that Scott was required to prove the working conditions about which he complained actually were unsafe. The instruction merely and correctly stated that he was required to prove that he made a complaint in good faith about unsafe working conditions.

When reviewing the effect of challenged instructions, the question before us is whether a reasonable jury would have interpreted the instruction in the manner complained of by the appellant. (*People v. Williams* (2013) 56 Cal.4th 630, 687; *People v. Cain* (1995) 10 Cal.4th 1, 36.) No reasonable jury would have interpreted the instruction to require Scott to prove that working conditions actually were unsafe. (See, e.g., *Keith v. S.S. Goldstone* (1978) 81 Cal.App.3d 699, 705 ["it seems to us that no reasonable reading of the instruction could lead to that interpretation"].) To the extent West Air's counsel stated otherwise, the trial court instructed the jury to follow the court's instructions, not the attorneys' interpretation of those instructions.[7] We presume the jury followed the court's instructions. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804; *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1415; *Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 162.)

Moreover, counsel for West Air subsequently made it clear in her argument to the jury that her point was that Scott's complaints were not about unsafe working conditions, but were about working conditions not to his liking. She did not repeat her statement that Scott had to prove working conditions were unsafe. It is not reasonably probable that the jury based its verdict on this one statement rather than the court's instructions. (Cf. *Bell*

---

[7]    Specifically, the trial court instructed the jury: "I'll now tell you the law that you must follow to reach your verdict. You must follow the law exactly as I give it to you, even if you disagree with it. If the attorneys have said or say anything different about what the law means, you must follow what I say."

18

*v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 764 ["any arguable claim of impropriety disappears if the argument is considered as a whole"]; see *Tingley v. Times Mirror Co.* (1907) 151 Cal. 1, 23; *Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, 210-211.)

Scott also suggests that the trial court should have given his proposed instruction instead of the one the court actually gave. Scott, however, does not point to anything in the record showing the language of the proposed instruction, that he proposed the instruction, or that the trial court rejected it. "Any reference in an appellate brief to matter in the record must be supported by a citation to the volume and page number of the record where that matter may be found. [Citation.] This rule applies to matter referenced at any point in the brief, not just in the statement of facts. [Citation.]" (*Sky River LLC v. County of Kern* (2013) 214 Cal.App.4th 720, 741; see Cal. Rules of Court, rule 8.204(a)(1)(C); *Hernandez v. Vitamin Shoppe Industries Inc.*, *supra*, 174 Cal.App.4th at p. 1453.) Nor does he point to any authority supporting his claim that the proposed instruction was a correct statement of the law. A "party asserting trial court error may not . . . rest on the bare assertion of error but must present argument and legal authority on each point raised." (*Boyle v. CertainTeed Corp.* (2006) 137 Cal.App.4th 645, 649.) As a result, Scott has forfeited claim of error with respect to the proposed instruction. (See *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286-287; *Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 195.)

Moreover, the instruction that Scott proposed, and that the trial court refused to give, was incorrect, and the trial court did not err in refusing to give it. Scott's proposed instruction read: "Scott claims that he was terminated for reasons that violate a public policy. To establish this claim, Scott must prove all of the following: [¶] 1. That Scott made a complaint; [and] [¶] 2. That the complaint contributed to West Air's decision to terminate him (even if other reasons also contributed to the decision)."

Labor Code section 6310 does not prohibit terminating an employee for having "made a complaint." It prohibits terminating an employee for having "made a bona fide oral or written complaint . . . with reference to employee safety or health." (*Id.*, subd. (b);

19

*Cabesuela v. Browning-Ferris Industries of California, Inc.*, *supra*, 68 Cal.App.4th at p. 109.) Thus, Scott's proposed instruction was an incorrect statement of the law.

Moreover, in discussing the instruction the trial court proposed to give, Scott's counsel complained about the "with reference to" language taken from Labor Code section 6310, subdivision (b). Counsel for Scott stated he "would say [the complaint] has to be *about* a safety complaint, and that's the revised wording that I was trying to suggest." (Italics added.) After further discussion the trial court agreed to substitute "of" for "with reference to," and counsel indicated that this was acceptable. Scott therefore has no basis for complaint about the language of the instruction. (See *Reilly v. Inquest Technology, Inc.* (2013) 218 Cal.App.4th 536, 552 [agreeing to ruling on jury instruction waives claim of error on appeal]; *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1005-1006 [same].)

### C. *Breach of Contract Instruction*

Scott's discussion on the jury instructions on the breach of contract cause of action, his objections, and the trial court's ruling is unsupported by any citations to the record. As noted above, a party must provide a citation for "[a]ny reference in an appellate brief to matter in the record." (*Sky River LLC v. County of Kern*, *supra*, 214 Cal.App.4th at p. 741.) We are "'not required to search the record on [our] own seeking error.' [Citation.] Thus, '[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been [forfeited]. [Citation.]' [Citations.]" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246; accord, *People ex rel. Strathmann v. Acacia Research Corp.* (2012) 210 Cal.App.4th 487, 502-503.) Therefore, Scott has forfeited his claim of error with respect to the breach of contract instructions.

Moreover, the instructions on the breach of contract cause of action were correct. The trial court instructed the jury: "Steve Scott claims that he and West Air Inc. entered into a contract for employment of Mr. Scott as a pilot, and that the terms of employment included that West Air would not terminate Mr. Scott because of a perceived

20

performance deficiency without giving Mr. Scott a performance evaluation and an opportunity to correct the deficiency, and would not terminate Mr. Scott for raising a safety concern. Mr. Scott claims that West Air breached this contract by terminating him based on one or more perceived performance deficiencies without first providing a performance evaluation and giving him an opportunity to correct the deficiency, and/or terminated Mr. Scott for raising a safety concern. Mr. Scott also claims that West Air's breach of this contract caused harm to Mr. Scott, for which West Air should pay. West Air denies that it entered into a contract of employment with Mr. Scott that included the terms claimed by Mr. Scott and instead contends that Mr. Scott was an at will employee. At will employment means that the employment relationship may be ended by either the employer or the employee at any time for any lawful reason, or for no reason at all. There is a presumption that an employment is at will. This presumption may be overcome by showing that the parties agreed that the employer's power to terminate would be limited in some way."

Scott argues that the instructions given by the trial court "improperly required the jury to choose between contradictory provisions in West Air's Employee Handbook," and "that the jury was told, erroneously, that the existence of the agreements Scott claimed to exist, on the one hand, and the 'at will' provision of the contract, on the other, were mutually exclusive." Scott acknowledges that the trial court properly instructed the jury on the two contract provisions that he claimed West Air breached: that West Air would not terminate him for raising safety concerns and that West Air would not terminate him without first giving him a performance evaluation and an opportunity to cure any deficiencies. Scott argues, however, that the trial court erred in further instructing the jury on West Air's defense that Scott was an at-will employee. In Scott's view the court should only have instructed the jury on his "contentions concerning what the agreements were and whether they were breached, there being no relevance to 'at will' doctrine or evidence that his employment contract was 'at will.'"

The trial court properly instructed the jury on each side's theory of the case. It is well established that "[a] party is entitled upon request to correct, nonargumentative

21

instructions on every theory of the case advanced by him [or her] which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572; *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475; *Bay Guardian Co. v. New Times Media LLC* (2010) 187 Cal.App.4th 438, 465.) This rule applies to both parties, not merely the plaintiff. (See *Phillips v. G. L. Truman Excavation Co.* (1961) 55 Cal.2d 801, 806 ["[i]t is hornbook law that each party to a lawsuit is entitled to have the jury instructed on all of his theories of the case that are supported by the pleadings and the evidence"], overruled on another ground in *Soule*, *supra*, at p. 580; *Graham v. Consolidated Motor Transport Co.* (1931) 112 Cal.App. 648, 651 ["it is the duty of the trial judge to instruct the jury upon every reasonable theory of either party finding support in the evidence"].) "If the opposing parties rely on different theories, instructions should be given, when requested, on the theory of each party." (7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 258, p. 312; see *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 694.) Thus, Scott was entitled to rely, and have the court instruct the jury, on the safety complaints and performance review provisions in the Associate Handbook, and West Air was entitled to rely, and have the court instruct the jury, on the at-will provisions in the handbook. Moreover, contrary to Scott's assertion, the two breach of contract instructions were not "mutually exclusive." The at-will instruction told the jury, consistent with Scott's claim, that the presumption of at-will employment "may be overcome by showing that the parties agreed that the employer's power to terminate should be limited in some way."

### D. *Sufficiency of the Evidence*

Scott argues that he "offered easily sufficient evidence that his complaints about hypoxia and the solutions he suggested were complaints of unsafe working conditions," and that "West Air offered no evidence that could support a determination that Scott's

22

complaints were not of unsafe working conditions." The record, however, contains substantial evidence to support the jury's verdict to the contrary.[8]

It is true that Jordan testified, "Scott brought up several areas of concern that concerned him safety-wise." As Jordan also testified, however, Scott's concerns "were self-inflicted, and he was rejecting any kind of training or guidance [Jordan] was giving him to mitigate these issues." Scott expressed concern about hypoxia, but West Air's planes were equipped with the EROS mask system to provide supplemental oxygen when necessary to prevent hypoxia. In other words, the planes had safety equipment in place to prevent hypoxia. Scott's real complaint was that he preferred a nasal cannula to the oxygen mask. Scott even told Jordan: "It's a compatibility issue. It's very difficult to wear the headset, the mask, sunglasses, and drink water at the same time." Thus, there was evidence from which the jury could have concluded that Scott's complaints were not about unsafe working conditions but were about undesirable or inconvenient working conditions. In fact, the record is replete with evidence from which the jury could have concluded that West Air terminated Scott not because of any expressions of concern about safety, but because he constantly complained about everything that was not to his liking, he was unwilling to accept suggestions of ways to mitigate his concerns and difficulties, he argued and expressed his opinions when his supervisors attempted to instruct him on West Air's methods and procedures, and he took no responsibility for his actions or for ensuring the safety of the plane and its crew when he perceived there was a problem.

---

[8]     We note that, in contradiction to the well-established rules of appellate review, Scott recites mainly those facts that support his position and ignores those that do not. (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409; *Brockey v. Moore*, *supra*, 107 Cal.App.4th at pp. 96-97.) This is a sufficient basis on which to deem his challenge to the sufficiency of the evidence forfeited on appeal. (*Clark v. Superior Court*, *supra*, 196 Cal.App.4th at pp. 52-53; *Brockey*, *supra*, at pp. 96-97.) Because West Air has supplied us with a recitation of the evidence supporting its position, we nonetheless address Scott's claim.

Scott's testimony reveals a bad attitude and poor decisionmaking when faced with possible safety issues. According to Scott, on the Tuesday August 3 flight to Ontario, Matthews appeared to confuse the altimeter with the transponder. Scott "didn't think too much of it" at the time and did nothing. When it appeared to Scott that Matthews was experiencing "a little bit of confusion" and was going to turn into restricted airspace, Scott again did nothing. When Scott thought Matthews did not have clearance to land, Scott said he just sat there minding his own business. Even when Scott felt that something was wrong with Matthews, Scott did not take action because believed he "shouldn't have to intervene." It is reasonably inferable from this testimony that Scott was not concerned about safety and was willing to expose himself and a coworker to unsafe conditions. Whether it was because Scott wanted West Air to provide him with a nasal cannula, because he wanted to show that he was a superior pilot, or because of some other reason, Scott made, in Jordan's words, "a very poor decision" by not taking action in a situation Scott felt was exposing Matthews, the plane, and himself to danger.

Jordan also testified that he was "frustrated with [his subsequent] conversation" with Scott, because Scott rejected "any kind of training or guidance I was giving him to mitigate" Scott's concerns. Each attempt at assistance brought on a new complaint. Wood similarly testified that Scott "constantly interfered with the training experience. He was not receptive to guidance, and training, and experience and learning." Like Jordan, she did not consider Scott's "comments to be complaints about unsafe conditions at West Air." Rather, "[t]hose were comfort issues." She denied recommending his termination "because he made safety complaints or complaints about unsafe conditions." Jordan's notice of termination stated that West Air was terminating Scott because Scott failed to demonstrate reliability and good decision-making skills, was argumentative and defensive when Jordan attempted to find ways to mitigate Scott's concerns, and was not receptive to Jordan's attempts to provide him with additional training.

Scott asserts that he "offered easily sufficient evidence that his complaints were a motivating cause of his termination. The termination letter itself states that Scott's

24

concerns were a motivating cause." Scott misapprehends the standard of review and the issues before this court.

The question before us is not whether Scott presented sufficient evidence to support a verdict in his favor but whether there evidence is sufficient to support a verdict in West Air's favor. When the appellant challenges the sufficiency of the evidence to support a verdict or judgment, "the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the [verdict or judgment]." (*Green Trees Enterprises, Inc. v. Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784, italics omitted; *City and County of San Francisco v. Ballard* (2006) 136 Cal.App.4th 381, 396.) Substantial evidence supports the jury's finding that West Air did not terminate Scott "'for making a bona fide'" or good faith oral or written complaint of unsafe working conditions. (*Cabesuela v. Browning-Ferris Industries of California, Inc.*, *supra*, 68 Cal.App.4th at p. 109; accord, Lab. Code, § 6310, subd. (b).)

Scott also argues that he "provided ample evidence, in the form of the Associate Handbook, of an agreement not to terminate without first giving a performance evaluation and opportunity to cure any noted deficiencies. . . . [¶] West Air failed to offer substantial evidence that Scott was provided with the agreed-to evaluation and chance to cure." Scott does not discuss the language of Performance Evaluations section of the handbook or cite any authority in support of his assertion that West Air's failure to provide him with a performance evaluation and opportunity to cure breached his employment contract. "'"Appellate briefs must provide argument and legal authority for the positions taken. 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as [forfeited].'" [Citation] "We are not bound to develop appellants' arguments for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as [forfeited]." [Citations.]' [Citation.]" (*Sims v. Department of Corrections & Rehabilitation* (2013) 216 Cal.App.4th 1059, 1081; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.) We treat Scott's contention

25

regarding West Air's failure to give him a performance evaluation and opportunity to cure as forfeited.

## DISPOSITION

The judgment and order are affirmed.  West Air is awarded its costs on appeal.


SEGAL, J.*


We concur:



WOODS, Acting P. J.



ZELON, J.

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.